Good morning, Your Honors. Gennady Lebedev for the appellant on all three cases. I believe that the briefs have recited the facts fairly well as far as the issues in the case, so I'm not going to belabor repeating all that. I would just like to point out to that this is really an issue of whether there is a material question of fact as to the question of BP's decision to sell these properties and non-renew these dealers. And the question of fact arises at the time that BP conceived this scheme of selling off many of its real estate properties. And we know what the scheme was because we have all that evidence. When they conceived that, that was part of their decision to sell the properties. They didn't decide to sell one property here, one property there, one property there as separate decisions. They decided to sell a bulk number of properties and they decided how they were going to sell them. And they came up with this plan or scheme of how these properties would be sold. But before we get to the scheme, let's tackle the decision they made to get out of the real estate business in the first place. What is your best evidence in this record showing that that decision that they want to get out of the real estate business, they don't want to own these properties anymore, was part of a bad faith decision on their part and not a business decision that they made? Well, the decision, the standard is the decision must be in good faith and in the normal course of business. That's the standard. What's the evidence that shows that that decision was not a business decision that they made, whether it was a smart decision or a stupid decision? We're not involved with that. Just whether they made that decision in good faith. Right. I just want to be very technical about the language that we're using because, yes, this was a business decision. Clearly, it's a corporation making a decision to sell properties. So nobody's disputing that this wasn't a business decision. But the business decision was not made in good faith and in the normal course of business. That's what we're contending. What's the evidence in this record showing that this was not in good faith? The evidence is the plan, the scheme itself, because that was conceived as part of the business decision to sell the properties. Because the business decision to sell the properties wasn't made on a per property basis. The decision was made as we're going to sell all these properties and we're going to, in the course of selling these properties, put in a system pursuant to which third parties have no choice but bid not only on the fair market value of the real estate, but also on the value of the ongoing franchisees' goodwill of the business. You have no dispute that they made a conscious decision they wanted to sell the property, that you have no dispute with that. Your dispute is the way they went about selling them. My dispute is not only in the way they went about selling them, but in the decision in the way that they were going to sell them. It's part of the decision to sell. Perhaps we're crossing. In fact, if they had executed it in a way that met with your approval, you wouldn't have any quarrel with their decision to sell all the properties, right? I'm not sure I understand the question. Well, I mean, the initial decision to sell is not what's at issue here, is it? Well, it is what's at issue under the PMPA. The initial decision, I think what maybe the what's what seems to be unclear is that it's the decision to sell the property that under the PMPA must be in good faith in normal course of business. And what we're contending is it's not merely the decision. We're going to decide now we're going to sell these properties. Now let's decide how we're going to sell these properties. What we're saying is that that is one decision. I understand that, but I mean, but you don't you don't quarrel with the idea that they could sell the properties. Of course not. Yes. BP has the absolute right to sell their real estate. That's not even the question. And I've done it in a way that which you would concede was in was in proper procedure. You wouldn't be here. Right. So you're not quarreling with the initial business decision to make a sign to sell the property. I understand you're saying it's one to say right. It's that component of it. You're not quite right. What we're quarreling with is that is the compliance because this is not merely a landlord of a piece of real estate that somebody is subleasing who decides to sell that real estate. And that's the end of it. We wouldn't be here if that was it. This is a situation where you have a Petroleum Marketing Practices Act, the federal act passed by Congress that protects the franchisee dealers, which provides that if you are going to not renew a franchise, you have to comply with certain requirements. One of those requirements is a decision. Right. Yeah. Let's jump ahead a bit. And if I following what you said initially in answer to Judge Cowan, aren't isn't the most is your your pivotal argument. Goodwill. I mean, everything kind of flows backward from that. You don't think goodwill should have been included. Right. Not exactly. This is how BP has tried to couch our argument is to say that we merely want a discount on the price and that these are third parties, independent third parties bidding according to I think they use one of the judges on one of the cases use the normal market forces as a term. So because more normal market forces are involved, BP is just standing back and letting the market decide what the price of these properties were. If that was the case, that we wouldn't be here. But that's not the case. That's not what we're contending here. What we're contending is that BP consciously at the time they decided to sell these properties came up with a plan that the way they were going to do it was going to ensure that third parties would have no choice but bid on the market, on the value of the franchisees goodwill. And it's undisputed in this case that that BP doesn't have the right to sell the goodwill of the business that belongs to the franchisee. Let me back up then. Maybe I asked it in a way that didn't make sense. If goodwill had been excluded from this scheme, right off the top, there was no doubt that the goodwill would not have been bid on. Would you be here today? No. So really it gets down to whether or not the decision to include goodwill or not, whether that constitutes bad faith under the Act. Whether BP's decision to include goodwill. Technically speaking, BP is not going to admit that, yes, we decided to include goodwill. But the way they set it up, and BP isn't the one including goodwill, it's a third party that's including the goodwill. I'm talking about your argument, not their. That's correct. I would agree with that. But if BP sells their property in accordance with the procedure mandated by the Petroleum Act, you really don't have any goodwill as such. Not necessarily. And BP did cite case law where they contend that it's irrelevant that goodwill was included because these are independent third party buyers who have the right to By the way, we are not contending that BP, because one of the aspects of why goodwill was included here is because BP was not only selling the real estate, but they were also telling third parties that if you buy this real estate, we will give you a franchise. In fact, they made it mandatory that if you buy this piece of real estate for the dealers that are in this case, you must agree to a 15 year franchise with us. That's one of the conditions for purchasing this property. We are not necessarily contending that that was in and of itself improper because BP in this case wanted to get out of the real estate business, but they wanted to retain the volume that was coming into it through its outlets. So we're not necessarily that's a business decision. Your Honor, I do believe that that that is in and of itself not improper. But what I'm looking at is a totality of the circumstances, because not only did they do that, but they also advertised the volumes and the gasoline volumes that each station was selling to the public. And they advertised the amount of the receipts from the AMPM mini market that were being sold. And that fact by itself shows BP's intent, because there's no other reason to third parties to bid on this property, knowing that they're going to have a 15 year contract and to. Because they're bidding against each other to take into account what that property is generating business wise, and that doesn't belong to BP. I, I agree with you that the property is being sold by BP for more than the real estate furniture and fixtures would go if they're just selling real estate and furniture and fixtures and buildings. But the the way the PMPA is set up, you're only right under the under the under the that that act is to you don't have a right to inquire as to what the purchaser is is bidding on. You only have the right to meet to get to get the same right of first refusal. And there's nothing in the act which would indicate that Congress intended the courts to look in to see what the third party determined to pay, including your goodwill, i.e., the difference between what the land furniture and fixtures buildings are worth and what it's worth as a going business, which they're selling it for. So how could we, as a court, require BP to remit to the franchisees what the bidder bid in excess of what the land and building furniture and fixtures were worth when the PMPA says that all they have to do is to give you, Mr. Franchisee, what they could have sold it for, even though it included the goodwill, i.e., the excess of what it was worth if they were just selling it for land, building and fixtures. The act presumes that when a third party is bidding on a piece of real estate that the third party is being driven by market forces when it's an unadulterated type of BFO, bona fide offer. So the act presumes that. So in that situation, when a third party on a one-on-one basis is making a bid to purchase a piece of real estate, the franchisee does not have the ability to challenge that. He must accept that as the fair market value of the property. Even if the offer includes goodwill, all right. Exactly. Now, the problem here is, I mean, there is the case of Ellis, which does talk about, in that case, there was a third party who was buying a bulk of properties. So there are multiple properties. And it was impossible to determine what value the third party was assigning to each separate property because they were paying a bulk price for a group of properties. In that situation, the court said, well, here we are going to allow you to inquire into what the third party, into what the fair market value of each property was. And so we're going to go by appraisals of these properties. And that's going to be the correct purchase price. They're going to find that that is not in accordance with the PMPA because you cannot discern the values. This is similarly a unique case in that the question here is not that we're challenging what the third parties did from their perspective, because what they did was reasonable to them. They're looking at all the figures. They're looking at the AMPM store sales. They're looking at the gas volume sales. They are required by the contract to submit to a 15-year franchise agreement. So they have all these things. But what I'm looking at is BP's state of mind when BP conceived this scheme and whether that was in good faith in the normal course of business. And we're saying it's not in good faith and it's not a normal course of business the way they set this up, because the way they set it up deliberately ends up forcing third parties to bid on the will. In other words, the third parties no longer have a choice to say we're not going to bid on the goodwill because they're going to get outbid. But does the Petroleum Act, I mean, they would argue the Petroleum Act gives them that prerogative. They could sell a property. There's nothing in the PMPA that says they could only sell it without continuing their oil business and gas business. They could sell it on any conditions they want so long as under the act, what price they get, they give you the right of first refusal or better. Well, so they're selling unquestionably, they're selling the property for more than the property is worth. They're selling it because it's worth more because a franchisee has been in there and shown that it's worth more than the physical parts. And that's goodwill. But under the act, it says that they could sell it for whatever they want. If they give you the right of first refusal, it's not that they can sell it for whatever they want. They can sell what they own for whatever they want. And they do not own the goodwill of the business. Well, the question is whether or not you really have a right to the goodwill of that business when you're a franchisee subject to their right of selling the property that they own on which that business is located. If you're right. It's not really a true analogy, but if you're a tenant at will, so to say, the PNPA came out and that's exactly what they did. They kicked you out. And so your only rights now are under the act before you had no rights at all. And so previously they would kick you out and sell it for whatever they did. And they got the goodwill out of it. Now they could sell your goodwill if you have goodwill. And the argument could be made that under the Petroleum Act, you really don't have any goodwill because they could sell it. They could sell that business as long as what they get for it. They could offer you the right of first refusal or better rights. They cannot sell your goodwill. I respectfully disagree with that. And that's also in the act. Your clients just sell the goodwill. Of course, our client, my client could sell the business to another buyer. You said just sell the goodwill. Of course. Yes. Property. Right. My clients, if they hadn't been non-renewed, which if BP did not comply with the PNPA, they would not be non-renewed. They could sell their business to a third party. Absolutely. But the selling, segregating the goodwill from the assets would yield the value of zero for the goodwill, wouldn't it? No. The goodwill of a gas station is highly valuable. They're being sold all the time because under the PNPA, the franchisee, that franchise may not be terminated or non-renewed unless it's complied with the PNPA. And if the franchisee is in business and they have a lease or if that lease cannot be non-renewed and BP must renew it, the franchisee has the absolute right to sell that business to a third party for whatever price they want. No, I agree with you on all that. But let's say you say, well, I'm going to sell the business. I'm just going to sell the goodwill. Well, the business is the goodwill. I mean, you can't segregate, that's what I'm saying. Right. The going concern value. The going concern value, correct. Yeah, that's what I'm referring to as goodwill. You get the going concern value, but I get to keep all the assets. Aside from the Ellis case. Well, the assets meaning real property or personal property. You can't segregate. You're in the sale. Right. Now, the only thing I would like to mention with regard to what Judge Cohen indicated is one of the ways that BP could have non-renewed these franchises was to give, rather than advertising these properties to third parties out in the open market and get a third party offer, they could have gone directly to the dealer and made an offer to the dealer pursuant to fair market value of the real estate. Now, they didn't do that in this case, but they had a right to do that under the BP would have been bound to limit its offer to a price that approaches fair market value. And that means that it would not include the goodwill of the business. And that's where that comes from. Well, fair market value of the property, you determine that by what you can earn off the property. No, I disagree with that because appraisers can appraise the property at the fair market value of the fee simple plus the growing concern. The growing concern is what BP would not be able to offer to the dealer because that's something the dealer already owns as the growing concern of the franchise, the goodwill. If they would approach the dealer directly and let's say the physical assets, land building and so forth are worth $500,000 and the business, because of the goodwill, the money you make off those assets is worth another $300,000. Could they say to the franchisee, look, we're buying this property and we're going to give you. We're going to give you $500,000 for it. You mean they were selling the property to the dealer? Yeah. And they were going to give the deal. They're selling it to you. We're selling this and we want you to pay us $500,000 plus the $300,000. We want $800,000 for the property. And your argument there would be you're selling me my own goodwill, but they could ask anything for that property they want. They could say, look, the physical assets are worth $500,000. But the fact that you put the physical assets together with a with with selling gasoline, that property is worth $800,000. And your argument again would be that you're making me buy my own goodwill. That's correct, Your Honor. And they would not be able to do that. What you're saying, they cannot do under the PMPA because under the PMPA, they can only sell what they own and what they own is the real estate. They do not own the business. They don't own the ongoing concern. So they could only offer the real estate to the dealer, not the going concern up to the dealer. So if they take away the real estate, so where's the going concern? But that's just it. They can't take away the real estate unless they make an offer under the PMPA. So the dealer has the opportunity to buy it. And just backing up, why do they have to say, look, the real estate's only worth $500,000. We're not going to give you the extra $300,000 that it's worth as a going business. They could say, yeah, but that real estate is is you don't own that. That's really not your goodwill, because that's goodwill. Which comes from this a unique combination of the real estate, it's it's not your goodwill. And we're going to require you if you want to buy the station to pay us $800,000. That goodwill is exactly what the PMPA was created to protect. The PMPA was created to protect the dealer, to give them the opportunity when an oil company decides they're going to get out of business at that station or terminate you, to give you an opportunity to continue in business. Your goodwill, your going concern. And so the PMPA does not allow a franchisor to sell you back your own goodwill. It can only sell you what it owns and what it owns is the real estate, the equipment, the improvements. Now, when you're dealing with a third party offer, which is what we're dealing here with, it becomes a little bit more murky because you don't have any control over what third parties are thinking when they're making bids on your property. So you just have to accept that what the third party is offering is the fair market value of whatever they're buying. The problem in this case was is when BP came up with this scheme to sell the property, it built into it a fail safe mechanism by which third parties would have no choice but bid on the goodwill. So in other words, they got their cake and they want to eat it, too. They got they got to sell the property at its fair market value of the fee simple and they got the value of the growing concern of the business, which just bumped up the price of the real estate, which if they had gone directly to the dealer, they would not be able to do. Now, in the end, all of these dealers in this case did end up matching those prices and they're still in business at those locations. But they severely overpaid for them because they paid for they bought their own their own goodwill value back from from BP, which BP couldn't sell. So BP is trying to say that, well, we have no control over what third parties do. The third parties are their own businessmen. They're making their own decisions. And we can't be telling third parties don't bid this much money on the property because we're businessmen, too. We want to make as much as we can. I have no quarrel with that, except in this case, they set up the system in a way by which third parties had no choice but bid on those. And that's a question of fact. That's what that's that's the evidence that's out there. If we buy your argument, then, in effect, the the companies could never sell these these these gas stations without the third parties, without having a breakdown of what the third party is paying in excess of the value of the land, building and furniture and fixtures. There have to be some way to ferret out what that goodwill is in every case. That's not it at all, Your Honor. Respectfully, that's absolutely not true. Oil companies sell real estate all the time. This is a very unique case of how the real estate is being sold. BP could have gone out there, said, OK, third parties, we have a piece of real estate. Do your due diligence. We are mandatorily requiring you to enter into a 15 year contract with us on the for the franchise and just leave it at that. Let third parties bid on that. But they didn't do that. They went a step further. They not only advertise the sales, which are confidential, but they also, when third parties made bids, they told the third party, you know what, if you decide to back out of this deal, we'll give you a breakup fee. And the third parties that got out of these deals, when our client matched the price, got $10,000 or $12,000 as a breakup fee. So they had an incentive to up their bids because the higher the bid, the bigger the breakup fee. Next thing they did is they said, well, as a third party, some third parties when we have declarations from them, when they when they bid on the property, said, I changed my mind. I don't want to buy this property anymore. BP said, well, hold off. Wait, wait a little longer. Don't don't back out now. Not the three cases for us. With the three case for us, it's the record is pretty clear that they had ready, willing and able buyers. Not necessarily, Your Honor, because and the other problem is what I'm talking about. Yes, these third parties that want to back out doesn't necessarily pertain to this case. But it does show BP's state of mind with regard to its decision to sell these properties in good faith, because if they're telling third parties, don't back out. Wait until the dealer accepts the offer. That's not good faith. And that. Yeah. But in this case, there's no question, is there? I mean, it's that the three bona fide offers that they got for the properties here, the four bona fide offers, that the parties, if you didn't accept the right of first refusal, that it would have closed. Well, there is evidence that some of them hadn't applied for loans yet, even in this case, and they weren't ready. There's also evidence with regard to Mr. Tong, that the third party was a multi-site operator, which means he had other gas stations and he wasn't approved to be a multi-site operator. So there's evidence to that effect as well. But that's not the purpose of my argument right now. What I'm saying is that there is evidence in the record that shows BP's state of mind with regard to, look, we just want to jack up the price on these properties as high as we can. And then the dealer is going to end up buying it anyway. We'd rather have the dealer buy them because they're more experienced in the business anyway. But we're going to give them a choice that they can't refuse. They're going to have to pay overpay for this because the third party has no choice but to bid on this as high as they can, including the goodwill. Well, the problem with that is if you jack up your bid and you never know, maybe the franchisee in the facility is not going to accept it. And then you're going to have to close for what you bid. That's correct. But you're also going to buy the goodwill, which I mean, you're not jacking up your bid artificially. You're bidding on something. You're bidding on the goodwill. But for the franchisee, he shouldn't have to buy the goodwill because he owns it already. So unless there's other questions, I'll rest on that. Good morning. Appellant's argument essentially asks this court to undermine the ROFR procedure that Congress established as a simple and straightforward procedure. The very inquiries that the appellants are asking the court to undergo is exactly what Congress concluded and what Keener Court said the court should not go. The ROFR procedure was set up that as long as you complied with the PMPA, as Judge Cowen pointed out, that that is all you need to do is provide an offer that is at least as good, or in this case better, than the offer that was provided by the third parties to each of the franchisees. Except in this case, there's no question you're selling your real estate for more than the real estate buildings and fixtures are worth. You're selling. If you didn't sell that as a going gas station, you would not get the by the present franchisee. So you are selling there. The person buying the property is paying for that property more than the furniture, fixture, land and building is worth. They're paying for what that that's going to be worth by reason of a going concern, aren't they? No, Your Honor, I disagree. They are paying for a location that has a branded gasoline station on there. It is a and to the extent there is additional value to that location because ARCO picked that location, developed the gas site, got the permits and developed the brand. You know, ARCO is then entitled and even Mr. Gennady is entitled under those circumstances to get a third party offer and have, you know, the franchisee ultimately match that offer. The value, if you will, of that real estate is tied up in the branded location under those circumstances. What Mr. Gennady seems to be focused on in terms of his concern are two things that ARCO advertised the gas volumes and that ARCO advertised the food sales. That was raw data that ARCO owned. It was proprietary data that was just as much ARCO. It was in fact ARCO's. It reflected the actual gas sales that ARCO made to the franchisee and it reflected the total amount of food sales upon which ARCO charged the royalty. It is simply illogical to believe that in any given circumstance that somebody is going to pay upwards of a million dollars and not want to know all of the information with respect to that property. And ARCO provided that information whether it was good, bad or indifferent. It provided it with respect to every one of the 52 sites and every one of those 52 franchisees accepted the right of first refusal with respect to that. Well, there are transactions in which somebody just would buy a location, a convenience store based on their own analysis of the market, whether or not how many cars go by, etc. I mean, so it's not unheard of that people would bid on a branded station just without any knowledge of the sales. It happens. I concede that that does happen, Your Honor. But it's also... You gave the value added because you thought you would enhance the value by showing the sales. No, of course you did. If you didn't think that it would help your sale, you wouldn't give them the data. Now, whether that's a consequence... But I would say that that would be right if, in fact, we hand-selected which stations we were putting the data out. But we didn't. We took an entire portfolio. Some were high-performing stations, some were middle-performing stations, some were low-performing stations. And we provided the information not in order to enhance the value, but in order to get full disclosure so that the buyers would have as much information as possible under those circumstances. The other point that counsel seems to make is that somehow, by virtue of the fact that there was a breakup fee, that ARCO engaged in bad faith. It is standard procedure with respect to any third party who is going to be buying a property on a contingent basis, knowing that they may go through all the due diligence efforts, have all the transaction costs of entering into a purchase and sale agreement, doing the due diligence versus for the environmental, and then have the transaction sold out from under him because there's a franchisee standing in the wings as a third party, that under those circumstances, in order to make it worth their while to cover the basic costs of the transaction at that point, a 1 percent breakup fee is typical and usual in any type of real estate development under these circumstances. Let me go to the declarations and the appraisals that the appellants seem to focus on for their pieces of evidence. If anything, those declarations best illustrate the litigation quagmire that the Kingdom Court was concerned about, that if the courts go behind the four corners of the purchase sale agreement and start looking at the subjective intent of the declarants under those circumstances, as this court essentially said in Ellis, that when you have essentially an arm's length transaction in a single site for cash, the court can infer that that sets the fair market value and that's all that the franchisee is entitled to. I urge the court not to turn the ROFR procedure into what we have here that appellants are arguing, which is every case becomes an issue of fact. That's what Congress specifically designed the ROFR procedure so that it would not occur. With respect to the appraisals, those two are subject to whatever assumptions or manipulation that is provided in the given case. And if you actually go and look at the appraisals that are in the record in this case, you'll find that appellants counsel instructed each of the appraisers not to essentially do a comparative sales analysis with respect to any other branded facility, whether it be Chevron or Exxon. And so what you wind up with is a group of appraisals that are based on an assumption. And if the court is going to allow ultimately a subjective determination to be made by going behind the four corners of the documents, every case will become an issue of fact, a battle between the individual appraisers under those circumstances. I assume, though, in every transaction, the goodwill is probably going to be identified for tax purposes anyway, right? If that's the issue. I'm not saying it is, but I mean, you can it's not it's not a. No, it's parties. I mean, generally speaking, they would allocate goodwill just because it has to be allocated for tax purposes. No. In this case, with respect to these 52 transactions, all ARCA was selling was the real estate value of the real estate and the equipment it did not allocate because it was not selling any type of of its existing business. There was no allocation for goodwill under these circumstances. Yeah, but the problem with that argument is they're not really selling that they're getting a bid from a third party for more than the real estate and the building and fixtures are worth. They're getting a bid from a third party, which shows what a business would make, which at that location and the difference between that is, according to your adversary, is the goodwill that they built up by having the gas station there for years. So you're in strict economic terms and we're not economists. You are getting more from this for this property than what you the physical property that you own. And that difference is the goodwill that they worked up. But I beg to differ with you in any type of transaction like this. The seller is entitled to get the maximum price for the highest and best use of the facility. If the highest and best use of this facility is a branded gas station, whether it's an Arco station, a Chevron station, a Unocal station, Arco is entitled to recover that highest and best use value. And a buyer is actually going to and certainly it's a typical way to appraise a property, going to look at what the income stream is of a given piece of property. And that's all that Arco sold under these circumstances. If you're looking at it, that's a blind way of looking at it. I think I think you've got to acknowledge that you're getting more for this property from the third party bidder than the property is actually worth. You are getting. If you were going to sell this property, not for a gas station, for just selling it, you would not get the extra bump that is realized by reason of the goodwill of operating a gas station there. Now, you're in a position to sell this real estate and give them a franchise, a third party, give them a franchise. So the difference between what you you realize and what the actual physical assets are worth is got to be called something and call it goodwill or whatever. And, you know, from my perspective, what I would call that is the value of the location as a branded facility. But in some cases, that value is going to be, you know, one number. In other cases, we might sell a piece of property where, you know, in the L.A. housing market where you're going to put condominiums on that could be worth 10 times what it might be worth as a gas station. Except that you require that it be this be sold as an operational unit. Right. And that's that's part of the quarrel, I think, here, because you because and I suppose your argument is, look, we were entitled to to get value for the franchise agreement, the guarantee both ways that you're going to have a franchise for 15 years. They would say, well, no, you're only entitled to get the real estate. And by having the mandatory agreement and you artificially inflated the price of going concern versus liquidation. I realize that that's the argument. The fallacy in that argument is that ARCO could have, if it wanted to, sold the station obviously without sold it to Chevron, OK, without the ARCO brand, without the ARCO franchise, without the ARCO supply agreement, Chevron certainly would have looked at that station in a similar way, looked at what the gas sales were, looked at what the food was. If you put a Chevron station on this property, it is really this property is going to be worth a fortune. There's some people who think that the Chevron brand might be more valuable than the ARCO brand out there. Chevron would have would have put a bid. And at that point, which could have been significantly higher. And so whether it was an ARCO operating station or Chevron operating station, franchisees still would have been required if it wanted to purchase the station to have that offer under those circumstances. So there isn't anything magic about the fact that there was an ARCO franchise or other than mandatory. Now you had to pay for it, right? But what could the ARCO franchisee say? Well, I don't really want to stay here. There's a standard station across the street. And I can get that franchise. And so my question is, is there anything that would prohibit the ARCO franchisee from taking all the names, addresses and phone numbers of its ARCO customers and the people that come in and shop at the little grocery and move to the station across the way and send them little notices. If you want to get that same good service, we'll even do your windshield. Come on over here. Absolutely not. And that's a very key point here is that it's their goodwill that they can take wherever they want under those circumstances and that ARCO was not selling. ARCO did not seek to raid their employees. Say a third party bought the station and would the ARCO franchisee be required to leave those names there? Is there a covenant where if you leave the station, you can't solicit business from those people? No. Nothing of that sort at all. The franchisee was perfectly free to, and indeed, you know, when you look at the record and the fact that each of these franchisees bought these locations, you know, each of them made the economic decision that this was a good deal. It was better than using their million dollars to go buy the Chevron station across the street or the Shell station down the street under those circumstances. Are you saying that the goodwill is really the location? I am saying that to the extent people are going to describe the quote goodwill, that goodwill, if you will, is associated with what that location is worth as a branded station. And once ARCO followed the PMPA and made the determination in good faith and in the normal course of business to sell the location, anything the franchisee continued to own after that point ended at that point, and ARCO, as I said, only did not sell anything that the franchisee owned, didn't sell their permits, didn't sell their equipment, didn't sell their business operations, didn't sell their franchise rights, ended. Once we made the determination to sell, any future franchise rights ended. And the PMPA, I think, is clear and unambiguous in that respect. But I think really whether it is of consequence or not, you structure the deal so you get going concern value. There's no doubt about that, is there? You'd have to concede that because if you didn't, you wouldn't have made the franchise mandatory. You sold it as a going concern. You didn't sell it as a standalone piece of real estate. We sold it as a standalone piece of real estate with the value of a branded facility, with a brand new franchise relationship, new type of business, completely different economics that whoever, whether it was going to be the third party or the franchisee that was going to be operating this, they would be responsible for all of their own tanks, all of their own environmental problems. There would be a different royalty structure. There wouldn't be rents under those circumstances. Right. Let me just put it another way. If you're just selling it as a straight piece of real estate, then you wouldn't have had the mandatory franchise requirement and you wouldn't have necessarily given up the sales figures because they would be irrelevant to someone who's just buying real estate. You saw, I mean, it was structured, maybe rightly or wrongly, but it was structured as a sale of a going concern because that's why they gave up the figures. You showed them, what can you do with this? It was structured as a sale that was going to have a new business operation on it. And the prior sales would be relevant history for anybody who was going to be entering into that new relationship. Well, it's a new relationship. It really wasn't a new business, was it? I mean, it was. You could say, well, take down Frank's and put Joe's on. It's the same location, same pumps, the same business. The economics of the business changed radically and completely once, as I said, the environmental risks change under those circumstances. The royalties change. The rents change. It's not the central part of this appeal. Matter of fact, it wasn't even argued. But there's some claim in the Bruce that some of these purchasers were not ready, willing and able. They didn't have bank loans in place. They didn't have firm commitments. What do you have to say? Let me briefly. First of all, as you pointed out in the one declaration where there was an inference that the appellants put up that they were keeping the third party offer, it was not in any of these cases. Not these four cases. Right. And despite days and days of deposition on the part of the appellants to look for any type of information, they were not able to bring to the district, the three district courts a single piece of fact that indicated that these were not ready, willing and able buyers. With respect to the loan issue in the one case that they have raised here, the purchase sale agreement gave the prospective buyer, I forget whether it was 45 days or a certain amount of time to get the loan approvals. They've had an opportunity to depose that third party buyer. They got a declaration from the third party buyer. If there was any evidence that that third party buyer was not ready, willing and able, that would have been put forth before the district courts. There is absolutely no evidence suggesting that these were not ready, willing and able buyers in these four cases. Unless the court has any further questions, I would just close and urge the court that the only issue here really is a matter of law. There are no factual issues. I just want to ask you a personal question. Are you related to Clifford Hammerling? I am. I am not. I don't believe. I thought you were raising somebody else, Clifford Gilbert. Or Gary Hammerling? No. Because I went to law school with a Clifford Hammerling. He was my partner for a few months. And then we parted. But he was a very successful lawyer in L.A. And I don't know if he's spelled his name the same way, but I thought, well, maybe this is, you know, one of his... I should say, not that I'm aware of, Your Honor. This wouldn't be a bad deal for you, because I think the family owned half of Anaheim. I'll investigate it. What did you say? I'll investigate it. Yeah, let's go to it first. I think, yeah, Ron Bisney. I want to first address the inquiry from Judge Cohen. Badru Khan, who is one of the declarants and the third party bidders in this case, who was bidding on the Guman Station, which is part of the May case, he indicated that he didn't even apply for financing at the time that he made the bid. So there's no indication of that. And then as far as the Tung case, Corona Management, Mr. Singh declared that, well, the issue with Mr. Singh is that he was not an approved multi-site operator. So there is no approval at the time that he made the bid for him to have more than one site. And that's undisputed at the time. Now, as far as the rest of the points raised by counsel. As you probably can tell now is that BP will never admit that it was trying to sell the goodwill of these dealers because it knows that it cannot do that under the PNPA. And that's my point here. The focus from BP has always been, and they cite the Keener case, and the focus in that case and the focus from BP's side, they're trying to turn my argument around in a way that I don't want to be turned around, is that they're focusing on the dealer or on the bidder's state of mind and saying, look, this is a simple procedure. The bidder's made a bid, it's an arm's length transaction, and the court should not get That's the second prong of the test. The first prong and the prong that we're here today is, are there material questions of fact on the issue of whether BP made its decision to sell these properties in good faith and in the normal course of business? So the focus is on BP's state of mind, not on the third party bidder's state of mind, because if BP did not make its decision in good faith and normal course of business, then it did not comply with the PMPA. And the second part that counsel is arguing, that's part of the remedy. And the remedy, we suggest, is the same remedy that was developed in Ellis, where if you cannot figure out the price, you go to the appraisers, and the appraisers decide in a trial. So the focus of our appeal and of this case is on BP's state of mind, and I believe that there's sufficient evidence in the record to show, and I think all the justices have hit on the point, that did BP intend to include Goodwill in these bids? And it's more than just intend to do it, but they set up a system where it would be no way that Goodwill could not be included. But isn't when you set something up and you know it's a going business, and the franchisee has the right of first refusal, and of course, the prospective buyer, they know that. Of course. They know that. So they know, well, if they really want it, they're going to have to pay more money for it, because the other person who's already in there is going to want to stay, and is going to know that, well, is going to want to stay, so they're going to bid it up a little higher, because they want to really get the property and don't want the other person to take the property under the right of first refusal. Well, that, again, focuses on what is the, what is the third? Is that inherent in this whole thing? Well, not necessarily. We don't know what the third parties were thinking, except from what they declared in their declarations. I mean, just thinking about it. Well. I wanted a piece of property, and I knew that the present occupant had the right of first refusal. And I figured, well, a property is, you know, worth so much. And I really wanted that property, even though I'd pay more than what it was worth. Well, if you were bidding on a piece of real estate, that's the nature of the market. Of course, you're trying to figure out what is the market value of this property. Isn't that inherent in the right of first refusal, that it's going to cost your client more, you know, than just the fixtures and the land? Well, if touching on that, if the third party is thinking along those lines and a third party is buying a piece of real estate, you're absolutely right. But here we don't have that. Here we have a third party who's not only buying a piece of real estate. They're also buying a franchise or they're going to be buying a franchise. They're going to become a franchisee and they're going to have a gas station that's fully operational, has set customers. The customers are used to that station. They're used to the customer service they receive from that station. They're used to all the things, all the things that they get at that station, the clean rooms, the clean bathrooms, the nice looking pumps. And forget about the clean bathrooms, that's a fiction. Well, but that's part of the goodwill. But if it's dirty, then it'll make it worth less, obviously. But that's something that the dealer does, is maintain the appearance of the station and keep those customers coming back. And for a third party who knows they're going to just step into that, this dealer is out and I'm in, they're going to certainly bid higher than somebody else. The question here is not so much what the third party was thinking. The question here is, what was BP thinking? And did BP do this in good faith? And BP doesn't want to admit that it was trying to sell the goodwill. And that's exactly what they were trying to do. And they can't do that under the PMPA. So if they intended that, that's. Let's say they terminate your franchise legally. They have to pay your client for the goodwill factor? No, because they did it legally. They comply with the PMPA, they comply with the PMPA. You have to concede, though, that they're entitled to get the value of their branded franchise, right? No, because they're not selling their branded franchise. That's a separate agreement. That's part of the franchise agreement that the third party will now sign and pay a franchise fee for. So that's so they're not getting the value of the brand of their brand. What they're getting the value for is the value of the business. For example, if BP had gone directly to the dealer, as I previously mentioned, they could have done. The dealer would be terminated because the BP could not condition that sale on the dealer's continuance of the 15-year franchise, because that would be just their way of getting more franchise fees for a dealer who shouldn't be terminated in the first place. So in order for BP to go directly to the dealer, they would have to. They could not condition. They could give the dealer an option to continue the franchise, but they couldn't condition it on that. And so the dealer would then buy the real estate. BP would come in, remove all the ARCO branding trademarks, and the dealer would continue operating that gas station as either an independent dealer, Joe's Gas, or a brand with Shell Oil or Chevron. But the dealer would maintain whatever goodwill he had, and that is the relationship with his customers, the appearance of the station. Everything the dealer did to keep that customers coming back would remain because the dealer owns that. The only thing BP would do is remove its trademarks. And part of the goodwill is the trademark. Well, the trademarks aren't owned by the dealer. The trademarks are owned by BP. But and those trademarks aren't being sold as part of this deal. The third-party bidders aren't asked to bid on the trademark. The third-party bidders will have to pay a separate fee for that and enter into a new contract, as counsel has indicated, with BP for a 15-year franchise agreement. So the sale agreement is separate, apart from the franchise agreement. The entry into the franchise agreement is just a condition, it's a covenant to the sale agreement. No, but I think the argument is that part of the going concern value of the business may well be attributable to the brand, and that's separate apart from what you're paying on the trademark. Well, to the extent that third-party bidders are bidding on the brand, that's not, that's... It's not your property. Well, they're bidding on buying the property, the real property. The brand is something that's going to come with it. But what they're also bidding is what income that property is generating. And the income that that property is generating is something that the dealer has developed. The amount of gas being sold, the amount of sales in the A&P and mini-market, that's something the dealer has generated. I mean, the argument could be made that part of that reason for those sales is the brand. I'm sure, but is there because they have a credit card that's... You could make that argument, yes. But that's not the focus of this case. The focus of this case is BP knowing that it cannot sell the dealer's goodwill and thinking how can we benefit from it, came up with a system by which third-party bidders would be bidding on that. And that is the not-in-good-faith normal course of business that we're talking about here. And I believe that the court doesn't have to decide whether BP acted in good faith in the normal course of business because that's a question of fact. All the court has to do is decide is there sufficient evidence in the record from which a reasonable trial of fact could find that BP did not act in good faith in the normal course of business. And I believe that there is, which is it's actually very well outlined in my reply briefs where I point by point cite to the evidence that discusses as a whole what facts show that, what facts go to that question. Thank you, Your Honors. You know, very interesting. And buying gasoline is much more than just squeezing the pump. Oh, I've had, we've had others, believe me. Yeah, this is our first gasoline case. We got one more? Thank you, Your Honor. Just a minute, please. Oh, that's it, that was two minutes, yeah, yeah. Okay. All right. The court will recess till 9 a.m. tomorrow morning.
judges: Pregerson, Cowen, Thomas